UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ALANE TARATUSKA,<br>                              Debtor<br><br>ALANE TARATUSKA,<br>                              Plaintiff<br><br>v.<br><br>THE EDUCATION RESOURCES<br>   INSTITUTE, INC. and<br>THE UNITED STATES OF AMERICA<br>   DEPARTMENT OF EDUCATION,<br>                              Defendants | Chapter 7<br>Case No. 01-10361-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 05-1653 |

## MEMORANDUM OF DECISION

This matter came before the Court for trial on the Debtor's complaint for a declaration that her obligations on student loans that are currently held by The Education Resources Institute, Inc. ("TERI")[1] and the United States Department of Education (the "DOE") (TERI and the DOE are referred to jointly as the Lenders) are dischargeable. For the reasons set forth below, the Court finds under 11 U.S.C. § 523(a)(8) that repayment of the education loans would impose an undue hardship on the Debtor. Accordingly, judgment will enter for the Debtor.

## TRAVEL OF THE CASE

The rather long travel of this bankruptcy case from its inception over eight years ago to the trial in this adversary proceeding has bearing on the outcome of the case, and therefore I

---

[1] During the course of this proceeding TERI itself filed a petition in this district for relief under Chapter 11 of the Bankruptcy Code, Case No. 08-12540-HJB (U.S. Bankruptcy Court, D. Mass.). On May 2, 2008, relief from the automatic stay was granted in that case for this adversary proceeding to go forward.

take the time to lay it out here. The Debtor commenced her case under Chapter 7 of the Bankruptcy Code by filing a voluntary petition on January 16, 2001. Although she received a discharge on April 25, 2001, she did not then seek a determination that the student loans at issue here were dischargeable. Consequently, the case was closed.

On December 12, 2005, and as a result of certain collection actions taken by one or both of the Lenders, the Debtor filed a motion to reopen the Chapter 7 case for the limited purpose of litigating the issue of whether the student loans were dischargeable. My predecessor, Judge Robert Somma, allowed the motion to reopen the case on December 14, 2005. Almost immediately the Debtor commenced this adversary proceeding against the Lenders. Also named as defendants in the Complaint were certain other alleged lenders, but those parties have since been dismissed.

On June 1, 2007, the Debtor filed a motion for partial summary judgment as to defendant TERI. The motion was premised on the argument that the educational debt owed to TERI was not one to which the exception to discharge in § 523(a)(8) of the Bankruptcy Code applied at all, regardless of whether it constituted an undue hardship. After significant briefing and argument, Judge Somma allowed the Debtor's motion for partial summary judgment and entered judgment against TERI.[2] Judge Somma's ruling, however, was reversed on appeal by the District Court and remanded to this Court for trial on the merits of the undue hardship issue.[3]

## THE FACTS ESTABLISHED AT TRIAL

**A. The Debtor's Student Loan Indebtedness**

The parties have stipulated that as of December 1, 2008, the Debtor owed TERI $39,278.12, with a per diem accrual of interest of $2.58. As of the date of the trial the amount owed to TERI had grown to approximately $39,629. Per the parties' stipulation, as of January 9,

---

[2] *Taratuska v. TERI et al.*, 374 B.R. 24 (Bankr. D. Mass. 2007).

[3] *TERI v. Taratuska (In re Taratuska)*, No. 07-11938 (D. Mass. Aug. 25, 2008) (Young, J.).

2

2006, the Debtor owed the DOE $63,488.47, which amount had grown to $73,379.91 by the time of trial.  The interest accrual per diem on the DOE obligation is $5.67.

The Debtor's history of repayments on these debts is short.  With respect to the loans held by TERI, she made one payment of $250 on March 15, 2002 and further payments totaling $1,500 during November and December of the same year.  The Debtor has never made a payment on the DOE loan.

**B.  The Debtor's Education**

The Debtor attended Bard College from the summer of 1981 through the spring of 1983.  She planned to study medicine after college.  She had difficulty in her studies at Bard and eventually transferred to Sarah Lawrence College.  She attended Sarah Lawrence for the 1983-1984 and 1985-1986 academic years and eventually received her bachelor of arts degree from that institution in 1991.  Later, after some work experience, she attended Boston University.  She chose Boston University because of its learning disabilities program, but she left after one semester when she was unable to get the services she needed to accommodate her learning disability.  It was during this time at Boston University that the Debtor incurred the obligations to a private lender that were guaranteed by TERI and that give rise to TERI's claims in this case.  She was not able to transfer any of her credits earned at Boston University after she left the program.

When the Debtor did not return to Boston University she enrolled in a masters degree program in neuroscience in 1996 at Brandeis University, where she earned a masters degree in 1998 and had a grade point average of approximately 3.75.  The DOE obligations were incurred in connection with the Debtor's studies at Brandeis.

**C. The Debtor's Personal Background and Medical History**

The Debtor testified at length about her personal and medical history, which testimony the Court found credible. At the time of the trial the Debtor was a forty-six year old woman. She has never been married and has no children. Her childhood family consisted of herself, her parents, and her two younger siblings. Her family life was unhappy and marked with trouble. She testified that her father physically abused her, her mother, and her siblings. She explained that this abuse gave rise to early psychotic episodes in her life wherein she felt her mind to be floating free of and disengaged from her body, an effect she called splitting. In addition she testified that she was sexually assaulted by a group of neighborhood boys when she was a child, but she felt she could not complain about this at home. The resulting instability in her life, and the insecurity she felt, were compounded by the fact that her father was not a competent and consistent provider for the family. The family moved frequently. This instability led her to constant worry about how she and the family would be supported. She began working at age twelve in order to buy clothing, and her grandparents provided much of the basic support for the family.

Throughout her life, the Debtor has faced—and continues to face—a consistent series of health challenges. Again, the Debtor described these issues in a detailed and credible manner. She suffered from a learning disability, which she characterized as dyslexia. This required that she receive educational accommodations and support. In her adult life the Debtor has suffered and continues to suffer from repetitive motion syndrome, irritable bowel syndrome, chronic laryngitis and, most significantly, a series of significant and long-term psychiatric deficits. She also suffers from and is being treated for a form of dermatological cancer. While young, she suffered from several psychotic episodes that she described as "splitting," which she attributed to the abuse of her father. She has had consistent suicidal ideation, and she attempted suicide at least once, in 2001, for which she was hospitalized.

The Debtor offered the expert testimony of Andrea Celenza, Ph.D., a clinical

4

psychologist.  The Court found Dr. Celenza's testimony helpful and credible.  Dr. Celenza treated the Debtor for thirteen years, beginning in 1990.  She based her testimony on the thirteen-year treatment history as well as on interviews of the Debtor in 2006 and 2008 and the Debtor's testimony at the trial, which Dr. Celenza attended.  In addition, Dr. Celenza interviewed the Debtor's current treating psychiatrist and reviewed her clinical records of recent treatments.  Based on the foregoing, Dr. Celenza rendered the opinion that the Debtor suffers from post traumatic stress disorder, major depression with episodic psychotic features, generalized anxiety disorder, and pain associated with psychosomatic conditions.

Dr. Celenza attributed much of the Debtor's psychiatric condition to atypical worries about her financial situation.  She demonstrated by use of a graph an association between periods of financial stress and instability in the Debtor's life and her episodes of psychiatric breakdown, showing convincingly that the former act as triggers for the latter.  According to the expert, the Debtor's atypical worries stem from the instability she faced as a child from her father's chronic unemployment and perhaps psychiatric problems of his own.  The Debtor's suicide attempt followed upon her learning that she might lose her apartment at a time when she could not afford a new apartment.  Dr. Celenza testified that the "Debtor is trying hard not to repeat her father's life, not to become her father, and trying to maintain a life that will say to her every day that she is not her father."  In sum, Dr. Celenza opined, "I think that the fact that [the Debtor] can break down to the point of thinking of killing herself, I think that it doesn't get more extreme."

As to the Debtor's prognosis, Dr. Celenza testified that "[b]ecause the trauma was so constant and throughout her childhood . . . , it may be that she will need supportive psychotherapy . . . for many years. . . .  I know that she will, given her state now, she will still need it for many years."  By this and other evidence, the Debtor established that her psychiatric condition has been of long duration, has no foreseeable end, and is likely to continue for many years.  The Lenders offered no expert testimony to rebut the testimony of Dr. Celenza, which

5

the Court found credible.

**D. The Debtor's Employment History and Current Financial Situation**

Since receiving her degree from Brandeis in 1998, the Debtor has worked consistently in her field of bioscience research. At the time of trial, she was employed by CC Corporation as an assistant scientist, a position she has held since March 2004. She is a project leader in this position. Prior to March 2004 she worked as a clinical research intern at the Spaulding Rehabilitation Center in Boston and as a senior research associate at Curis Neuroscience Group in Cambridge.

The Debtor's current gross monthly income is $5,772.06, which on an annual basis is $69,264.72. Her net monthly pay as of May 2009 was $3,704.47. The deductions, beyond state and federal taxes, include health/dental/vision insurance, a modest 401K, and a Flex health spending account.[4] The Debtor has also received an annual bonus in the amount of between $2,000 and $4,000 for the years that she has been with CC Corporation, as well as an average pay increase of 2.5%. In addition, the Debtor has received tax refunds, including an expected refund of $1,800 for 2008, and sporadic help from her mother approximating $200 per month.

The Debtor's expenses were described in detail at the trial and in agreed exhibits. In total, her monthly expenses average between $5,100 and $5,400. In reality, her expenses to support her lifestyle are quite modest. She spends approximately $2,300 per month on rent, automobile, groceries, and other usual expenses. But she spends nearly $3,000 per month on uninsured medical and dental expenses, which she pays for partly with monies channeled into her Flex spending account and partly through her take home pay. These expenses relate to three sessions per week of psychiatric counseling, as well as physical therapy, insurance co-

---

[4] The Flex health spending account merely allows the Debtor to pay certain uninsured health-related expenses with pre-tax dollars and is not a true "deduction." Joint Exh. 16.

6

payments, medications, and other health-related expenses. In summary, the Debtor's net pay each month is $4,183, assuming an historically large bonus of $4,000 and a tax refund of $1,800. Against this are her monthly expenses of $5,250, which total includes no payment on her student loans. Consequently, the Debtor operates at best at a break-even level (aside from the modest savings she sets aside to replace her car), and even this ability to break even is dependent on the support she receives from her mother.

The Debtor's assets consist principally of an automobile and a checking account. The automobile has a blue book value of $12,610 and the checking account an average balance of $11,100. She also has a small 401K account. The Debtor has virtually no debt. She buys her automobiles for cash after she saves up for a new one because she is afraid to incur the debt that would otherwise be needed to acquire a new vehicle. She has never bought a house or a condominium. Her "atypical" concerns about her financial condition, as well as her bankruptcy filing, make her a poor candidate for credit of any sort. She is not emotionally capable of having a car loan or other installment debt. Moreover, she is always searching for a new job as a hedge against possible unemployment. As a result, her savings and her vehicle are not really properly viewed as assets above her monthly needs.

## POSITIONS OF THE PARTIES

The Debtor concedes that this is "an unusual case, even within the universe of student loan discharge cases that typically turn on highly individualized facts."[5] The Debtor recognizes that she operates at a high level within her profession but points out that she can achieve this level of functionality only with intensive psychotherapy. The cost of this therapy is extreme and, with her other regular medical expenditures, approaches $3,000 per month in excess of her insurance coverage. Thus, she has nothing left each month to pay even the interest on her student loans. The Debtor argues that without her treatment she will be unable to function and

---

[5] Plaintiff's Posttrial Brief, p. 20.

may return to her suicidal ideation. The Debtor points to the unrebutted testimony of Dr. Celenza that this situation is likely to persist for the foreseeable future. Based on the foregoing, the Debtor contends that she is unable to repay her student loans because to do so would result in undue hardship to her.

As legal support for her position, the Debtor points to *Reynolds v. Pennsylvania. Higher Education Assistance Agency (In re Reynolds)*, 425 F.3d 526 (8th Cir. 2005) and *Renville v. Montana Guar. Student Loans (in Re Renville)*, 2006 U.S.Dist. LEXIS 81217 (D.Mont. Nov. 3, 2006). The Debtor argues, citing these cases, that the stress of a debtor's massive educational debt can exacerbate the debtor's mental illness sufficiently to support a finding of undue hardship. The *Renville* court discharged student loans because the loans exacerbated mental illness resulting from the debt, making repayment an undue hardship. The Debtor argues that her student debts exacerbate her mental illness even more fundamentally than did the debts in the cited cases and that to repay those debts would result in undue hardship.

The Lenders urge me to apply the undue hardship standard articulated in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d. Cir. 1987), the so-called *Brunner* standard, instead of the alternate totality of the circumstances test; but they maintain that the Debtor cannot establish an undue hardship here regardless of the standard applied. First, the Lenders argue that the Debtor's monthly expenses are capable of reduction without undue hardship. Second, the Lenders argue that the Debtor's mental and physical illnesses do not require a finding of undue hardship. As to reduction of the Debtor's expenses, the Lenders point to an analysis of the Debtor's last thirteen checking account statements and argue that her total expenses are only $3,478.51 on average, not the $5,133 in expenses urged by the Debtor. Moreover, the Lenders focus on the fact that the Debtor has been able to accumulate over $11,000 in savings during the thirteen month period from May 2008 to May 2009. Next the Lenders review the impact of reducing or eliminating the Debtor's Flex health savings account, her 401(k) retirement savings contributions, and a series of other expenses such as movie

8

rentals and audio books to establish that the Debtor could make payments to them.  As a consequence of these savings the Lenders argue that the Debtor could pay $1,255 per month towards her student loans.

The Lenders also argued that the Court should consider whether the Debtor's request for a discharge of her loans should be denied if she could participate in the William D. Ford Federal Direct Loan Program's Income Contingent Repayment Plan ("ICRP").  Under ICRP an eligible debtor may pay no more than twenty percent (20%) of her discretionary income as defined by the tax code.[6]

## THE APPROPRIATE LEGAL STANDARD

A bankruptcy discharge does not apply to student loan debt that is subject to 11 U.S.C. § 523(a)(8) "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."[7]  The burden of proof lies with the debtor on the issue of undue hardship.[8]  "Proof of undue hardship is generally found only in 'truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents.'"[9]

Much has been written about the various standards that the courts in this Circuit and elsewhere have applied in determining whether the Debtor has met her burden of establishing undue hardship.[10]  These standards are born of the fact that "undue hardship" is not defined in the Bankruptcy Code.  Essentially, the courts have applied one of two approaches:  either the totality of the circumstances approach or the *Brunner* test.  The only significant difference

---

[6] *ECMC v. Bronsdon (In re Bronsdon)*, 421 B.R. 27 (D. Mass. 2009).

[7] 11 U.S.C. § 523(a)(8).

[8] *In Re Nash*, 446 F.3d 188, 190-91 (1st Cir. 2006).

[9] *ECMC v. Bronsdon (In re Bronsdon)*, 421 B.R. at 32, citing *T.I. Fed. Credit Union v. DelBonis*, 72 F.3d 921, 927 (1st Cir. 1995).

[10] See, *e.g.*, *Kopf v. Department of Education*, 245 B.R. 731 (Bankr. D. Me. 2000); *Fahrenz v. Educational Credit Management Corp. et al.*, 2008 WL 4330312 (Bankr. D. Mass. 2008).

9

between the tests is that under *Brunner* the Debtor must establish that she made a good faith effort to repay the educational loans at issue.[11]  The Debtor's efforts to repay may be considered by the Court when applying the totality of the circumstances test, but evidence of those efforts is not determinative.[12]

The Bankruptcy Appellate Panel for the First Circuit articulated the totality of the circumstances test as follows in the case of *Lorenz v. Am. Educ. Servs.*, 337 B.R. 423, 430 (B.A.P. 1st Cir. 2006):

> The "totality of the circumstances" analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other pre-petition debts.

I am persuaded that the totality of the circumstances test frames the inquiry most appropriately.  Under either test, the initial focus is on the Debtor's current and future ability to repay the student loans.  But the totality of the circumstances test allows the Court to consider the facts and circumstances unique to each case and to measure the impact of those facts and circumstances on the Debtor's ability to pay now and in the future.  While this inquiry would include the Debtor's efforts to repay the loan, I am not persuaded that those efforts should rise to the level of a determinative factor.

---

[11]  *Id.*; see *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir. 1987).

[12]  *Educational Credit Mgmt. Corp. v. Kelly*, 312 B.R. 200, 206-207 (B.A.P. 1st Cir. 2004).

**APPLYING THE TOTALITY OF THE
CIRCUMSTANCES TEST TO THE EVIDENCE IN THIS CASE**

The first two elements of the test require the Court to consider the Debtor's past, present, and future financial resources in light of her reasonable, necessary living expenses. In this case the Debtor has considerable income and is likely to continue to be able to earn income at the level she has achieved in the past. She has been consistent in her ability to generate such income from her employment as a scientist in the biotechnology business. The problem is that the Debtor is required to spend all of her net earnings and more in order to pay for the mental health services, medications, and other services and accommodations that her psychiatric condition—and, to a lesser extent, her other medical problems—necessitate in order to live a semi-normal life. Indeed, the unrebutted testimony of Dr. Celenza is to the effect that the Debtor requires this therapy in order to avoid suicidal ideation. As is demonstrated above, the Debtor's fragile mental state, in combination with other medical needs, requires that she expend all of her disposable income on uninsured medical care if she is to receive the mental health services and other medical care that she requires. Moreover, there was no evidence that the Debtor's psychiatric condition will improve over time sufficiently to significantly reduce her need for these therapies. Indeed, the evidence supports the opposite conclusion.

While the Debtor is able to work and earn a salary, she can do so only if she spends so much of her monthly income on therapy that she has nothing left each month to pay on her student loans. In short, without the intensive psychotherapy that she requires two or three times per week, she is vulnerable to a psychiatric episode that would limit her ability to work, or much worse. Any of the reductions in her expenses proposed by the Lenders—health club fees and movie rentals—would not have a meaningful impact on her ability to pay and are necessary for her to maintain her mental health.

As to the ability of the Debtor to repay her student loans in the future, the Debtor produced evidence that her medical and psychiatric needs will continue into the future and likely for the rest of her life. In response, the Defendants produced no evidence that, either through

11

medical advances or alternative therapies, the Debtor would become well enough to avoid the intensive therapy that she described at trial. Nor did the Defendants produce evidence to establish that the Debtor can or will in the future re-orient her life in a manner that would permit her to pay back her student loans. Based on theses factors, I conclude that the Debtor has carried her burden of proof on these issues by a preponderance of the evidence. Consideration of these factors therefore supports the conclusion that the Debtor cannot repay her student loans without undue hardship.

However, the totality of the circumstances test also requires that the Court consider "any other relevant facts and circumstances" that pertain to this debtor's ability to repay her loans. Application of this prong of the test is ultimately determinative here.

This case is similar to the case of *Reynolds v. Pennsylvania Higher Education Assistance Agency et al. (In re Reynolds)*, 425 F.3d 526 (8th Cir. 2005). The debtor in *Reynolds* was diagnosed with a major depressive illness, and her psychiatrist testified that her student loans caused her stress that made her treatment more difficult.[13] The Court reasoned that although Reynolds had some disposable income available at the end of each month to pay something toward her student loans, "the mere existence of this debt burden is a significant block to the Debtor's recovery from mental illness" and that eliminating the debt would reduce the possibility of recurrence of her illness.[14] Citing to the findings of the bankruptcy judge, the circuit court found that "although Reynolds may be performing adequately at her current job and may therefore have some disposable income available to dedicate to the [student] debts, . . . she [is] at risk for recurrence . . . of her illness."[15] The court concluded that "the mere existence of this debt burden is a block to her recovery from mental illness and that eliminating the debt would mitigate her symptoms and reduce the possibility of recurring depression and

---

[13] *Id*. at 528.

[14] *Id*. at 533.

[15] *Id*.

decompensation."[16] Based on this analysis the Court determined that excepting her student loans from discharge would have caused Reynolds undue hardship. Indeed, the *Reynolds* court, applying the totality of the circumstances approach, ruled that the debtor's student loans themselves exacerbated her mental illness and precluded its resolution. The Court found, on its facts, that repayment of the loans itself was an undue hardship.[17]

As in *Reynolds*, the existence of the student loan debt in itself creates an undue psychiatric hardship for the debtor. Even aside from its effects on her ability to support herself and pay her medical bills, the nondischarge of the student loan debt would impose an undue hardship on the debtor by its direct psychological and psychiatric effects on her. Because of her unusual psychiatric history and condition, she experiences this debt as unduly oppressive. Hers is more than the usual anxiety, even intense anxiety, that debtors would and frequently do feel in the face of overwhelming debt and financial insecurity. Her degree of anxiety may in fact be irrational, but it is nonetheless quite real and has serious consequences on her mental health and ability to function.[18] I find that it rises to the level of severity required to constitute an undue hardship.

I also conclude that the Ford program offers nothing to the Debtor in this case. The defendants have adduced no evidence or explanation as to whether and how the Ford Program would alleviate the burden of this debt on the Debtor, or that she would even qualify for relief thereunder. In any event, the continuing burden to the Debtor of her illness, even as modified by the Ford Program, would represent an undue hardship. The Debtor's illness cannot be

---

[16] *Id*. "Decompensation" here appears to be a psychiatric term meaning "failure of defense mechanisms resulting in progressive personality disintegration." *Dorland's Illustrated Medical Dictionary*, 349 (26th ed. 1985).

[17] *See also Renville v. ECMC (In re Renville)*, 2006 WL 3206126 (D. Mont. 2006) (discharging student loans where debtor's mental illness required medical expenses that negated his ability to repay loans).

[18] *See* Testimony of Dr. Celenza at Trans. P. 206 L. 4-21 ("financial stress is actually the core of [Debtor's] fears . . . I think that is the central thing.").

effectively treated if she remains liable for her student loans.

## CONCLUSION

In sum, under the totality of the circumstances, I find that the Debtor has demonstrated, by a preponderance of the evidence, that excepting her student loans from discharge would impose upon her an undue hardship. In the unusual circumstances of this case, where the mere existence of the debt either exacerbates her illness or precludes its effective treatment, repayment of the student loans meets the statutory standard for discharge. Based on the foregoing, the Court will enter judgment for the Debtor.

Date: February 12, 2010

_____
Frank J. Bailey
United States Bankruptcy Judge